Edwin Harvey Blum v. Commissioner.
Blum v. Commissioner
Docket No. 25711.
United States Tax Court
1952 Tax Ct. Memo LEXIS 175; 11 T.C.M. (CCH) 612; T.C.M. (RIA) 52186; June 18, 1952
Edwin Harvey Blum, pro se. Earl C. Crouter, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined a deficiency of $1,567.08 in income tax for the year 1945. The question presented is whether or not petitioner, as an author, is entitled to the benefit of section 107 (b) of the Internal Revenue Code. Respondent's disallowance of $250, allegedly paid as agents' commissions, is not in issue. Findings of Fact Petitioner filed his individual income tax return for the calendar year 1945 with the collector of internal revenue for the sixth district of California, at Los Angeles. He reported income on the community property basis with his wife, Beatriz Blum, who filed a separate return. Petitioner has been a motion picture writer *176 and dramatist by profession since 1934. He was the author of a literary composition, a motion picture story, entitled "A Guy and A Goddess", and later produced as the motion picture called "Down to Earth". On September 16, 1945, petitioner sold "A Guy and A Goddess" to Columbia Pictures Corporation for the sum of $25,000. The entire amount was received in 1945. In his 1945 return, claiming a right under section 107 (b), he distributed his share from the sale of the story over the 36 months prior to September, 1945 (four months in 1942, all of 1943 and 1944, and eight months in 1945). Before and during 1940, petitioner did initial research work to obtain background information for an original story which could be produced as a musical motion picture. This story was based on the idea of a supernatural force or person influencing the lives of a group of Broadway characters. Later in 1940, or early in 1941, petitioner conceived the thematic story idea of utilizing the Greek goddess, Terpsichore, as a supernatural force or person. It was his idea that the goddess would become incarnate and fall in love with a Broadway character. However, because he was a mortal and she a goddess, they *177 could not marry. Periodically during the years 1940 through 1945, petitioner discussed his idea concerning the supernatural story with other writers. During this period he also continued his research work for background material. Petitioner added new concepts to the basic idea, and deleted old ones. On September 12, 1944, petitioner registered a typewritten copy of the completed story, "A Guy and A Goddess", with the Screen Writers' Guild, Inc., at Los Angeles. On March 20, 1946, petitioner executed an affidavit for Columbia Pictures Corporation to be used by it in the defense of a proposed plagiarism suit. The affidavit depicted the conception and development of petitioner's story which was sold to Columbia Pictures Corporation. The affidavit, in part, is as follows: "In 1938 or 1939 I started to look for a backstage musical story with a supernatural aspect and intermittently for the ensuing two years spent a good deal of time exploring a succession of possibilities, which included, for instance, the spirit of a dead drama critic returning to earth to right the wrongs he had done, and the spirits of a song and dance team returning to earth and retracing their lives through time. *178 None of these approaches seemed to work out, however, and it was not until 1940 or 1941, when I came across an item in a magazine called 'Theatre', or a similar title, that I found what I was looking for. I place the date as 1940 or 1941, for I was reading the magazine in the course of doing research for a play I was contemplating writing, which was subsequently copyrighted in 1942 under the title 'Tiger by The Tail'. The item which attracted my attention contained a reference to the Muse of Song and Dance, Terpsichore. I made a note of the reference in a notebook which I have kept for many years specifically for such purpose. The note reads: 'Code of Terp. Sup. (meaning supernatural) Theatre Story'. I had, of course, heard of Terpsichore before, but this reminder of her name caused me to undertake research in the hope of using her and the other eight Muses as the supernatural element I had been seeking. My research took me through the dictionary, encyclopedia and other such references to a study of Greek mythology, particularly in the volumes entitled 'Classic Myth and Legend' by A. R. Hope Moncreiff, 'A History of Greece' by J. B. Bury, 'The Iliad' and 'The Odyssey' by Homer, 'The *179 Golden Bough' by Frazer, and the ancient plays of Sophocles, Aeschylus, Euripedes and Aristophanes. Naturally, I took specific cognizance of the numerous occasions in which gods, goddesses and other supernatural beings came down to earth and in the great variety of ways they concerned themselves with the affairs of mortals, and so influenced those affairs. It was entirely obvious to me, that in line with this classic tradition, I wanted Terpsichore, and perhaps the other eight Muses, to come down to earth and in some manner mingle with and influence the lives of a group of mortals in backstage Broadway. I considered this at great length, but it was not until some time in 1944 that the thought came to me which finally opened up the entire story, the thought which in my estimation forms the basis of the present picture now in production. This was that Terpsichore comes down to earth for the purpose of playing the role of Terpsichore in a Broadway production, and all the complications that arise therefrom. This, in brief, was the development of the original story I sold to Columbia Pictures Corporation." During the years 1938 through 1944 petitioner worked for various motion picture *180 companies as a writer. This work, because of the nature of the business, only lasted for a few months with each of the companies. Petitioner's work on the story "A Guy and A Goddess" extended over a period of 36 months. Opinion Respondent contends that petitioner is not entitled to apply the provisions of section 107 (b)[1] in reporting income received from the sale of a motion picture story, and further that petitioner's gross income for the year 1945 is increased to include, as ordinary income, his community share of the income from the sale of the story. *181 Petitioner contends that he received the proceeds from the sale of the artistic work in 1945, and that work on the story, from beginning to completion, covered a period of 36 calendar months or more. He alleges, therefore, that he is entitled to compute his 1945 income tax under the provisions of section 107 (b). Since the respondent admits that the product which was ultimately sold was a literary composition, the sole question presented is, did the petitioner's work in the preparation and completion of the story extend over a period of 36 months or more? From a review of the evidence, we find that petitioner's work in the preparation and completion of his literary composition did extend over a period of 36 months. In determining the work period we must first ascertain when work was started on the story. Petitioner's discussions with other writers proves that he conceived the idea of writing a story with a supernatural element some time prior to 1940. Thereafter, from time to time, he obtained background information by reading Greek histories, certain classics, and stories and plays with a supernatural element. The record discloses that petitioner, in the latter part of 1940 *182 or earlier part of 1941, while doing research work, made a written memorandum concerning Terpsichore. Apart from the testimony that petitioner discussed or thought about his story prior to 1940, we can now fix an actual work period as starting at least by the early part of 1941. Unlike the taxpayer in Iliff David Richardson, 14 T.C. 547, petitioner did little writing or typing on his story. The bulk of the work consisted of planning and study of background material. In applying the intent of the statute to work entailed in writing a dramatic composition, it would be sophistic if we were to separate the work into (a) physical labor, such as typing, and (b) mental labor, and to hold that (a) should be counted as work on the project but that (b) should not. The construction of a plot, the development of the characters and the crystallization of the story theme into terms of conflict, suspense and final resolution are the results of mental activity. In terms of essentiality, the mental activity is more important than the physical work of writing or typing. In his brief the respondent argues that the story which was finally sold to Columbia Pictures Corporation was not *183 the story as originally developed by the petitioner. In answer to a similar argument in the Richardson case, supra, we said, at page 553: "* * * The preparation of any 'literary composition' is usually a process of writing and rewriting, cutting here and adding there. Even the preparation of so prosaic a thing as an opinion of the Tax Court is cast in the same mold. It has happened in the experience of the writer that a first draft of an opinion reaching one result is entirely discarded and an opinion reaching the opposite result finally arrived at. But who would say that the time spent in drafting and writing the discarded opinion was not part of the total time spent in preparing the final opinion?" The evidence convinces us that petitioner completed the work on his story on or about September 12, 1944, but the story was not sold until September 16, 1945. The requirement of 36 calendar months or more for a work period is met by the 36 months which preceded September 12, 1944. Petitioner has met his burden of proof and is entitled to report his income in accordance with the provisions of section 107 (b). However, since petitioner does qualify under this section, the question *184 of when the income is taxable must be determined. Should the tax be paid for the 36 months preceding the sale of the story, or the 36 months preceding the completion of the story? The Supreme Court interpreted the words "ratably over that part of the period preceding the close of the taxable year but not more than thirty-six calendar months" to mean that the tax was payable over a period of 36 months extending back from the close of the taxable year, as distinguished from the work period if the two periods were not concomitant in whole or in part. Robertson v. United States, 343 U.S. 711, (decided June 2, 1952), affirming 190 Fed. (2d) 680. Following this interpretation, the petitioner shall allocate the gain received from the sale of the story over the 36 months preceding January 1, 1946. See Regulations 111, section 29.107-2. Again this is in holding with the Supreme Court decision in the Robertson case. There the taxpayer's income was received on December 14, 1947. The Court held that the tax should be allotted to the period ending with the close of 1947 rather than exclude the month in the taxable year subsequent to receipt of the income. Decision *185 will be entered under Rule 50. Footnotes
1. SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY. * * *
(b) Patent, Copyright, Etc. - For the purposes of this subsection, the term "artistic work or invention," in the case of an individual, means a literary, musical, or artistic composition of such individual or a patent or copyright covering an invention of or a literary, musical, or artistic composition of such individual, the work on which by such individual covered a period of thirty-six calendar months or more from the beginning to the completion of such composition or invention. If, in the taxable year, the gross income of any individual from a particular artistic work or invention by him is not less than 80 per centum of the gross income in respect of such artistic work or invention in the taxable year plus the gross income therefrom in previous taxable years and the twelve months immediately succeeding the close of the taxable year, the tax attributable to the part of such gross income of the taxable year which is not taxable as a gain from the sale or exchange of a capital asset held for more than 6 months shall not be greater than the aggregate of the taxes attributable to such part had it been received ratably over that part of the period preceding the close of the taxable year but not more than thirty-six calendar months.↩